991 So.2d 445 (2008)
Gary L. MILLER
v.
CONAGRA, INC.
No. 2008-C-0021.
Supreme Court of Louisiana.
September 8, 2008.
*447 William P. Crews, Jr., L.L.C., William Preston Crews, Jr., Baker & McKenzie, Clayton E. Bailey, Por Hac Vice, for applicant.
Craig L. Davis, L.P.L.C., Craig Alan Davis, Lafayette, Gordon, Arata, McCollam, Duplantis & Eagan, L.L.P., Louis Middleton Phillips, Baton Rouge, for respondent.
CALOGERO, Chief Justice.[*]
This action for breach of contract and violation of Louisiana's Unfair Trade Practices and Consumer Protection Law raises issues regarding judicial estoppel, no right of action, and timeliness. For the following reasons we find that the Plaintiff is not judicially estopped from bringing this action. Also, we find Defendant is procedurally barred from asserting his exception of no right of action and Defendant failed to raise a valid exception to the courts' subject matter jurisdiction. Accordingly, we affirm Plaintiff's breach of contract awards. However, we find meritorious Defendant's argument that the claims under the Unfair Trade Practices and Consumer Protection Law are untimely, and we reverse the judgments of the lower courts in this regard.

FACTS AND PROCEDURAL HISTORY
The origin of this suit is a breach of contract and unfair trade practices claim brought by the plaintiff/respondent Gary L. Miller against defendant/relator ConAgra, Inc. ("ConAgra"). Defendant is referred to as "ConAgra" although that corporation has been succeeded by Pilgrim's Pride Corporation. On July 23, 1993, Miller and ConAgra entered into a "Broiler Production Agreement" wherein ConAgra agreed to provide young chickens for Miller to raise until they were sold on the commercial broiler market. When the chickens were the proper age and size, ConAgra would remove them from Miller's farm. Under the contract, ConAgra also supplied Miller with feed and medicine for Miller to use exclusively on ConAgra's chickens. The agreement had a term of ten years and required any party wishing to terminate the contract to do so in writing.
On December 21, 1993, less than six months after the Broiler Production Agreement had commenced, ConAgra accused Miller of stealing the chicken feed it provided and using it to feed his hogs. ConAgra offered Miller an opportunity to terminate the agreement or be faced with *448 criminal charges. Miller elected to terminate the contract. However, this termination was never placed in writing as the contract required.
Allegedly as a result of the contract's termination, Miller was forced to declare bankruptcy in 1996. Miller filed a petition under Chapter Seven of Title 11 of the United States Code. A bankruptcy proceeding was opened, a trustee appointed, and, on January 27, 1997, the trustee in bankruptcy issued a "Verification of No Asset Case  No Distribution Report." Based on this report, the United States Bankruptcy Court for the Western District of Louisiana signed a discharge order on February 24, 1997, releasing Miller from all personal liability for his declared debts.
On July 22, 1998, almost seventeen months after his bankruptcy discharge, Miller brought this lawsuit in our state's Tenth Judicial District Court, alleging that ConAgra breached the Broiler Production Agreement and caused him damages. On March 6, 2000, a little over twenty months after suit was filed, the district court allowed Miller to amend his petition to include claims under the Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401 et seq., commonly referred to as the "Louisiana Unfair Trade Practices Act" or simply, and hereinafter, "LUTPA." In that amended petition, he prayed for treble damages and attorney fees under the LUTPA statute. Miller also claimed that ConAgra's breach caused him mental anguish, which gave rise to nonpecuniary damages. After numerous delays, a bench trial was held from July 18 through July 20, 2005.
A week before the trial commenced, ConAgra filed a motion to dismiss, arguing that Miller should have disclosed this claim against ConAgra to the bankruptcy court as a potential asset, and therefore he should be judicially estopped from bringing this action. The district court denied the motion and the case went to trial.[1]
In the wake of the trial, there was a flurry of activity in the bankruptcy court. On July 26, six days after the trial had concluded, but before judgment was rendered, the trustee moved the bankruptcy court to reopen Miller's previously closed bankruptcy proceeding. The trustee also brought in the bankruptcy court an action for declaratory judgment to have this claim deemed a part of the bankruptcy estate. In that proceeding, Miller and the trustee entered into a consent judgment, signed by the bankruptcy judge, wherein the parties stated, "[T]he claim of the Debtor arising out of litigation in the Tenth Judicial District Court, State of Louisiana, captioned Gary Leroy Miller vs. Pilgrim's Pride Corporation successor to ConAgra Poultry be and it is hereby deemed property of the bankruptcy estate."
On September 14, 2005, ConAgra removed this case to the bankruptcy court, arguing that the matter was a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) and 157(b)(2)(O),[2] or, alternatively, was at *449 least "related to" Miller's bankruptcy proceeding and the bankruptcy court had jurisdiction pursuant to 28 U.S.C. § 1334(b).[3] The bankruptcy court subsequently remanded the case to the state court on November 7, 2005, concluding, "[T]he issue involved in this litigation was not a `core proceeding', as that is defined in 28 U.S.C. Section 157(b)."
With the case back in hand, the state district court rendered judgment for Miller on Jan. 9, 2006.[4] In its written reasons for judgment, the court found Miller's witnesses were consistent and believable, while ConAgra's witnesses were not. Based on these observations, the court found that Miller did not steal chicken feed from ConAgra. Rather, the true reason that prompted ConAgra's accusations was its need to reduce the number of its chicken growers, for ConAgra had lost a large contract to supply chickens, and faced an overabundance of growers. Thus, ConAgra used "strong-arm methods" to "improperly, and without just cause, terminate[] the Agreement with plaintiff."
From these factual determinations the district court concluded that ConAgra's conduct amounted to a bad faith breach of contract under LSA-C.C. art.1997 and thus Miller was entitled to all damages, foreseeable or not, that were a direct consequence of ConAgra's failure to perform.[5] The court also found that Miller was entitled to nonpecuniary damages under LSA  C.C. art.1998, because the contract was intended to gratify a nonpecuniary interest and ConAgra knew or should have known that the failure to perform would cause a nonpecuniary loss to Miller.[6] As to Miller's LUTPA claim, the trial court disagreed with ConAgra's contention that the claim was untimely, finding that ConAgra's actions had prevented from running the one-year period for bringing a claim under LUTPA.[7] The court also concluded that given the "unusual and unequal relationship between ConAgra and the chicken growers," applying LUTPA was "particularly appropriate." Thus, the court granted Miller treble damages and *450 attorney fees under that act.[8]
As to quantum, the district court awarded Miller $357,000.00 for losses associated with ConAgra's breach of contract; $202,250.64 for losses from the differential cash outflows for federal, state, and self-employment taxes (also referred to as the "tax-bunching effect"); and $75,000.00 in general damages.[9] These awards were trebled under LUTPA. To this sum was added $238,497.18 in attorney fees. In full, the district court's award came to $2,141,249.10, plus interest from the date of judicial demand.
After the district court rendered judgment, ConAgra unsuccessfully moved for a new trial. The parties litigated the timeliness of ConAgra's suspensive appeal and the amount of the appeal bond. See, e.g. Miller v. ConAgra, Inc., XXXX-XXXXX (La. App. 3 Cir. 7/19/06), 935 So.2d 388, writ denied, XXXX-XXXX (La.11/9/06), 941 So.2d 43. In the meantime, the bankruptcy trustee enrolled in this state court lawsuit as a party plaintiff on February 27, 2006, and, after Miller's Chapter 7 bankruptcy proceeding was converted to a Chapter 11 proceeding, the trustee then withdrew from the case on August 2, 2006.[10]
ConAgra appealed the trial court's judgment to the court of appeal, which affirmed the plaintiff's judgment. Miller *451 v. ConAgra, Inc., 2007-747 (La.App. 3 Cir. 12/5/07), 970 So.2d 1268. From that decision, ConAgra applied to this court for a writ of certiorari, which was granted. Miller v. ConAgra, Inc., XXXX-XXXX (La.3/7/08), 977 So.2d 915.

DISCUSSION
In its brief, ConAgra raised three assignments of error. First, it argued that the lower courts erred by failing to bar Miller's case because (a) Miller was judicially estopped, (b) Miller had no right of action or lacked standing, and/or (c) the court lacked subject matter jurisdiction. Second, ConAgra argued in the alternative that the lower courts erred by not finding that Miller's LUTPA claim was untimely. Third, ConAgra argued that if the court finds Miller's LUTPA claim was timely, the lower courts nonetheless erred in awarding treble damages because ConAgra was not timely given notice by the attorney general that its conduct violated LUTPA, a notice that the statute requires.[11]

I. Assignment of Error No. 1: Judicial Estoppel, No Right of Action, and Lack of Subject Matter Jurisdiction

A. Judicial Estoppel
We begin our analysis by discussing the issue of judicial estoppel. However, before we reach the merits of the judicial estoppel argument, it is necessary to examine first a procedural challenge to this defense: Was judicial estoppel properly raised at the trial level? In its written reasons for judgment, the district court found that ConAgra failed to prove the substantive elements of judicial estoppel, and therefore Miller was not estopped from bringing this claim. However, after discussing the issue the court also stated, "In addition, the defendant failed to properly raise this issue as an affirmative defense." This sentiment was repeated in the court's concluding paragraph: "No affirmative defenses were asserted by the defendant in its answer, thus those which defendant attempted to assert at trial are rejected." Miller contends that these statements amount to a finding that ConAgra waived its right to assert judicial estoppel under LSA-C.C.P. art. 1005, a statute that requires affirmative defenses to be raised in the answer.[12]
Regarding the trial court's finding that ConAgra had failed to properly raise judicial estoppel as a defense, we find to the contrary. First, we note that ConAgra filed "Responsive Pleadings" containing an "Answer" on July 15, 2005  admittedly seven years after ConAgra had been served with Miller's petition. We acknowledge that the filing of this answer was unusually delayed; however, it was not untimely. Although LSA  C.C.P. art. 1001 requires an answer to be filed within fifteen days of service of citation, the Code of Civil Procedure nonetheless allows a defendant to file an answer at any time prior to confirmation of a default judgment. See LSA  C.C.P. art. 1002.[13] No *452 default judgment was confirmed against ConAgra, nor was any step taken in the prosecution of a claim that would, in any respect, preclude the normal progression of this lawsuit. Thus, we find ConAgra's answer was not untimely.
Next, we note that within its responsive pleadings ConAgra incorporated "all prior exceptions and motions made of record herein." Four days prior to filing these pleadings, on July 11, 2005, ConAgra had raised judicial estoppel in the form of a "Motion to Dismiss, with Rule." Thus, judicial estoppel was incorporated by reference in ConAgra's designated "Responsive Pleadings." So while the defense of judicial estoppel should be raised in a timely filed answer, that was accomplished here. Consequently, to the extent the district court rejected ConAgra's judicial estoppel argument for failing to properly raise it, that decision was made in error.
Turning now to the merits of the issue, the Supreme Court of the United States has generally described judicial estoppel as an equitable doctrine designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment. New Hampshire v. Maine, 532 U.S. 742, 749-50, 121 S.Ct. 1808, 1814-15, 149 L.Ed.2d 968 (2001). Because it is an equitable doctrine, it is invoked at the court's discretion. Id. at 750, 121 S.Ct. at 1815. Although the New Hampshire Court discussed some factors previous courts employed in determining whether the doctrine was applicable, it also observed that the "circumstances under which judicial estoppel may appropriately be invoked are not reducible to any general formulation of principle" and "[a]dditional considerations may inform the doctrine's application in specific factual contexts." Id. at 750-51, 121 S.Ct. at 1815 (internal quotations omitted).
Applying judicial estoppel in a context similar to the one presented here (i.e., where a plaintiff is alleged to have failed to disclose an asset to the bankruptcy court), the United States Court of Appeals, Fifth Circuit, has recognized three requirements for applying the doctrine: (1) the party's position must be clearly inconsistent with a previous one, (2) the court must have accepted the previous position, and (3) the non-disclosure of an asset must not have been inadvertent. In re: Superior Crewboats, Inc., 374 F.3d 330, 335 (5th Cir. 2004). As to the third element, the Fifth Circuit has elaborated that a non-disclosure is "inadvertent" when the party to be estopped was unaware of the facts giving rise to his claim or there was no motive for concealment. See Jethroe v. Omnova Solutions, Inc., 412 F.3d 598, 601 (5th Cir. 2005).
While it appears that Miller's non-disclosure of this claim to the bankruptcy court and subsequent discharge in bankruptcy satisfied the first and second prongs of the Fifth Circuit's test, both the district court and the court of appeal found that judicial estoppel did not apply because the third requirement was not met, i.e. Miller's nondisclosure was in fact "inadvertent." On this point the court of appeal stated:
There is no indication in the record that Miller was attempting to deceive the bankruptcy court; in fact, the evidence shows that while he had made some inquiries, no lawyer had agreed to take his breach of contract case at the time the bankruptcy was pending. The trial court relied on this fact to conclude that Miller's inconsistent position taken in state court was inadvertent, and we agree. There is likewise no indication in the record that Miller was attempting to deceive the district court, the defendant, or the attorneys involved in this state court case regarding the fact of his *453 bankruptcy. Indeed, the evidence shows that all parties were aware of the prior bankruptcy.
Miller, 2007-747, p. 4, 970 So.2d at 1271.
ConAgra disputes this conclusion, arguing that Miller's non-disclosure of his claim was not inadvertent because he knew of the facts underlying his potential claims against ConAgra at the time he filed his bankruptcy case and during the pendency of that action. Furthermore, ConAgra asserts that Miller had a motive to conceal this claim: failing to report this claim might allow Miller to discharge his creditors through the bankruptcy proceeding such that any future recovery would not be subject to their claims.[14]
At first blush, ConAgra's arguments might seem persuasive. Under the federal bankruptcy rules, Miller was under a continuing duty to disclose all of his assets, including contingent and potential claims. See In re: Coastal Plains, Inc., 179 F.3d 197, 207-08 (5th Cir.1999) (citing 11 U.S.C. § 521(1)). According to Fifth Circuit jurisprudence, it was not necessary for Miller to be aware of the legal basis for his cause of action; "rather, if the debtor ha[d] enough information ... prior to confirmation to suggest that [he] may have a possible cause of action, then that is a `known' cause of action such that it must be disclosed." Id. at 208 (internal quotations and citations omitted). Thus, it would appear that because Miller was aware of the facts giving rise to his cause of action, he was duty-bound to disclose this claim as a potential asset of the bankruptcy estate.
However, this does not end our analysis. We are reminded of the Supreme Court's caution against reducing judicial estoppel to a general formulation or principle, as well as the Court's recognition that specific factual contexts may give rise to additional considerations. See New Hampshire, 532 U.S. at 750-51, 121 S.Ct. at 1815. For these reasons the New Hampshire Court refrained from establishing "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." Id. at 751, 121 S.Ct. at 1815. In fact, the New Hampshire Court ultimately looked to equity to resolve its judicial estoppel question. Id. at 755, 121 S.Ct. at 1817 ("In short, considerations of equity persuade us that application of judicial estoppel is appropriate in this case." (emphasis added)).
Keeping the tenets of New Hampshire in mind, we observe here that the equities in this case weigh against applying judicial estoppel, unlike in New Hampshire where the Court found judicial *454 estoppel appropriate. As discussed above, after Miller's trial concluded  but before the court rendered judgment  the bankruptcy proceeding was reopened. That court now awaits our resolution of this claim. Presumably, any damages awarded will be administered through that proceeding and be subject to Miller's creditors' claims. Viewed in this light, it is clear that Miller's creditors will be harmed if we bar Miller's claim. Here in fact, the only entity that has anything to gain by applying judicial estoppel is ConAgra. Recalling that judicial estoppel is designed to protect the judicial process, and not the parties, see id. at 749-50, 121 S.Ct. at 1814; In re: Superior Crewboats, 374 F.3d at 334, we find that protection of the judicial process is not necessary here, where the bankruptcy proceeding has been reopened and is pending.
It appears that the court of appeal was guided, at least in part, by this point when it stated:
The rules regarding bankruptcy proceedings allow for the later addition of assets to an estate. The post trial motions in the record indicate that Miller's bankruptcy has already been converted to allow for the distribution to creditors of the proceeds of this suit, although ConAgra's continuing litigation ensures that such distribution is still years away. While it is true that Miller, as a bankrupt whose debts have been discharged, is now seeking to collect an award stemming from events which occurred prior to his bankruptcy, it is likewise true that the operation of federal procedural rules ensure an appropriate result. The evidentiary concerns raised by ConAgra are consequently nondecisive.
Miller, 2007-747, p. 4, 970 So.2d at 1272.
Recently, the United States Fifth Circuit reached the same conclusion in a similar case. See Kane v. National Union Fire Insurance Co., 535 F.3d 380 (5th Cir. 2008) (per curiam). In Kane, the plaintiffs failed to list a pending tort action in their Chapter 7 bankruptcy proceeding, causing the Eastern District of Louisiana to invoke judicial estoppel to bar the claim. Id. at 383. On appeal, the Fifth Circuit observed that because the bankruptcy proceeding had been reopened and the trustee had not abandoned the claim, the plaintiffs stood to benefit from the action only if there was a surplus after all debts and fees were paid. Id. at 387. The Kane court also noted that the plaintiffs' creditors would be harmed if judicial estoppel were applied. Id. at 387. Thus, finding that the equities weighed against applying judicial estoppel, the Fifth Circuit distinguished the case from In re: Superior Crewboats and In re: Coastal Plains, Inc., and reversed the district court. Id. at 386-88. We find Kane analogous to the case at bar and affirm the lower courts' decisions to reject the defense of judicial estoppel.

B. No Right of Action/Lack of Standing
We next address the no right of action/standing issue. ConAgra asserts that because Miller failed to disclose this claim to the bankruptcy court, the claim remains a part of the bankruptcy estate and therefore only the bankruptcy trustee may pursue the claim, not Miller. Thus, Miller has no right of action or lacks standing to bring this claim, ConAgra argues. The trial court heard arguments on this exception on February 2, 2006, post trial, and held that ConAgra had orally waived this exception while preferring to urge the district court to consider an accompanying "Second Motion to Dismiss" based on judicial estoppel. See District Court's Judgment on Rule (February 15, 2006). The court of appeal also noted this in its opinion. See Miller, 07-747, p. 4, 970 So.2d at 1271 ("In the trial court, ConAgra *455 actually abandoned its exceptions in favor of its judicial estoppel argument"). Because ConAgra abandoned this argument at the trial level, we need not consider it here.

C. Lack of Subject Matter Jurisdiction
The third argument raised in ConAgra's first assignment of error is that the trial court lacked jurisdiction over the subject matter of this claim. ConAgra asserts that because Miller's claims belong to the bankruptcy estate, only the bankruptcy trustee had the power to initiate the lawsuit against ConAgra. Therefore, ConAgra reasons, the trial court lacked subject matter jurisdiction to hear this claim as there was an "absence of case or controversy" between Miller and ConAgra. ConAgra further contends that this argument cannot be waived, as an exception to a court's subject matter jurisdiction is not waivable. See LSA-C.C. art. 925(C).
We view this argument as merely a re-packaging of ConAgra's no right of action argument. ConAgra is arguing that "no case or controversy" existed between Miller and ConAgra because Miller is not the proper party to bring this suit. However, when the defendant's objective is to test whether the plaintiff has a real and actual interest in the action, then the proper vehicle for accomplishing that objective is a timely raised peremptory exception of no right of action. See Industrial Companies, Inc. v. Durbin, XXXX-XXXX, p. 11 (La.1/28/03), 837 So.2d 1207, 1216. Therefore, we construe this argument as an exception of no right of action and find that it was waived, as noted above.

II. Assignment of Error No. 2: Timeliness of Miller's LUTPA Claims
In its second assignment of error, ConAgra argues that the lower courts erred by not finding perempted Miller's LUTPA claim  a claim that allows treble damages and attorney fees. See supra footnote 8 (quoting LSA  R.S. 51:1409(A)). LSA  R.S. 51:1409, the statute creating a private action under LUTPA, states in subparagraph (E), "The action provided by this section shall be prescribed by one year running from the time of the transaction or act which gave rise to this right of action." ConAgra notes that the act giving rise to Miller's cause of action under LUTPA arose on December 21, 1993, but he did not assert his LUTPA claim until he amended his petition in March 2000  well outside the one-year period to bring the claim. Furthermore, ConAgra argues that despite the use of the word "prescribed" in the statute, the period is peremptive and thus may not be suspended or interrupted.
ConAgra cites several appellate opinions which construed LUTPA's time period to be peremptive. See Glod v. Baker, XXXX-XXXX (La.App. 3 Cir. 3/23/05), 899 So.2d 642; Capital House Pres. Co. v. Perryman Consultants, Inc., XXXX-XXXX (La. App. 1 Cir. 12/10/98), 725 So.2d 523; Canal Marine Supply, Inc. v. Outboard Marine Corp. of Waukegan, Ill., 522 So.2d 1201 (La.App. 4 Cir.1988). Supported by these cases, ConAgra argues that because LSA-R.S. 51:1409 created an action and provided the time period in which the action must be exercised, the period for initiating the claim is peremptive. Also, ConAgra asserts that LUTPA is penal in nature and therefore must be strictly construed to prohibit the application of the doctrine of continuing violation to prevent the commencement of the running of peremption.
The lower courts addressed this argument and sided with Miller's contention that regardless of whether LSA-R.S. 51:1409(E) is considered prescriptive or *456 peremptive, the period has not begun to run because ConAgra's unfair practices have persisted to this day. Miller supports his position with Fox v. Dupree, 633 So.2d 612 (La.App. 1 Cir.1993), and Benton, Benton, & Benton v. Louisiana Public Facilities Authority, 95-1367 (La.App. 1 Cir. 4/4/96), 672 So.2d 720, cases which found 51:1409(E) to be peremptive, but nonetheless found the period had not begun to run where the defendant continued to violate the statute. Here, Miller argues that because ConAgra maintains that Miller stole chicken feed, threatened him with criminal prosecution, and failed to comply with the terms of the Broiler Production Agreement by not terminating it in writing, ConAgra continues to violate LUTPA and its time period has not yet begun to run.
We do not agree with plaintiff Miller or with the lower courts' resolution on the timeliness issue. This court previously defined a continuing tort as one "where the operating cause of injury is a continuous one and gives rise to successive damages." Crump v. Sabine River Authority, 1998-2326, p. 7 (La.6/29/99), 737 So.2d 720, 726. Stated another way, "[a] continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act." Id. at 9, 737 So.2d at 728. Here, ConAgra accused Miller of theft and coerced him into terminating the contract on December 21, 1993. All performances under the contract ceased on that date. Because ConAgra's wrongful conduct triggering Miller's damages had occurred on December 21, 1993, the operating cause of injury was not continuous.
ConAgra's continuing allegations that Miller is a chicken feed thief occurred in the context of these proceedings as a means of explaining its rationale for terminating the contract. While the trial court found that ConAgra's accusation was untrue and motivated by its need to reduce the number of its chicken growers, we do not find its repeated denial of liability in these proceedings to amount to a continuous violation of LUTPA. It is axiomatic that ConAgra is allowed to explain its reason for seeking to terminate the contract without having its assertions construed as a continuous violation of LUTPA. To hold otherwise would be to require a defendant to choose between admitting liability on the one hand, and extending prescription by pursuing his defense on the other. Although ConAgra's acts allegedly violated LUTPA in 1993, the right to pursue that action ended a year later and was not revived by ConAgra's continuing to deny liability by asserting its rationale for termination years later.
Similarly, we do not view ConAgra's failure to terminate the contract in writing as a continuous violation of LUTPA. This omission was not the "operating cause" of Miller's injury, and it did not "give[] rise to successive damages." Id. at 7, 737 So.2d at 726. First, the operating cause of Miller's injury was ConAgra's accusations and coercion; ConAgra's decision to not memorialize the termination appears to be ancillary to the truly injurious act. Second, it is unclear that the failure to terminate the contract in writing has caused Miller any damages, much less damages that would be considered "successive" under Crump. Thus, we find Miller's contention that ConAgra's failure to formally terminate the contract constitutes a continuing violation of LUTPA to be an untenable position.
Because we conclude that ConAgra has not committed a continuing violation of LUTPA, we find it unnecessary to address whether LSA  R.S. 51:1409(E) is a prescriptive or peremptive statute. Regardless of how LSA  R.S. 51:1409(E) is interpreted, *457 Miller's LUTPA claim is untimely. Accordingly, the lower courts' awards under LUTPA  treble damages and attorney fees  may not stand.

III. Assignment of Error No. 3: Treble Damages
We find it unnecessary to discuss ConAgra's third assignment of error which protests imposition of treble damages, as that issue becomes moot in light of our finding Miller's LUTPA claims untimely. As we briefly mentioned above, see supra footnote 11 and accompanying text, ConAgra's third assignment of error asserts that in order to support treble damages under LUTPA, the offender must first receive notice from the attorney general that his behavior is an unfair trade practice under the statute and thereupon he continues to violate LUTPA. ConAgra contends that its complained-of acts occurred in 1993, and the attorney general did not provide it with notice that it had violated LUTPA until 2005. Therefore, ConAgra concludes that imposition of treble damages was improper because the attorney general's notice did not precede a continuance of the allegedly offensive conduct.
On this point, Miller argues that he timely notified the attorney general's office via certified mail of ConAgra's acts. Miller continues, "Since the Louisiana Attorney General's Office was notified, the requirement Plaintiff must meet in order to be entitled to recover treble damages was fulfilled."
Regardless of whether ConAgra's contention is correct, we need not address this matter because we have already determined that the LUTPA claim was not timely. Accordingly, we will reverse the treble damages and attorney fees awards under LUTPA, without having to hold specifically that there was no adequate and timely notification by the attorney general's office.

IV. Breach of Contract Claims and Damages
As discussed, before it trebled the damages and awarded attorney fees under LUTPA, the district court first found that ConAgra had breached the contract in bad faith per LSA  C.C. art.1997, and the circumstances also gave rise to nonpecuniary damages under LSA  C.C. art.1998. See supra footnotes 5 & 6 and accompanying text. On these breach of contract claims, the court awarded (a) $357,000.00 for losses associated with the breach, (b) $202,250.64 for losses from the differential cash outflows for federal, state, and self-employment taxes, what the court called the "tax-bunching effect," and (c) $75,000.00 in general damages.
Although ConAgra has challenged Miller's ability to pursue these claims (through its judicial estoppel defense and exceptions of no right of action and lack of subject matter jurisdiction), it has not asserted in this court that the district court's findings on the merits of these claims  including quantum resulting from these breaches  were incorrect. For this reason, we will not address further the merits of the quantum awards, and affirm the lower courts insofar as they awarded these damages.

CONCLUSION
Because we hold that plaintiff Miller was not judicially estopped from bringing this action, and defendant ConAgra waived its no right of action exception and failed to assert a valid lack of subject matter jurisdiction exception; we AFFIRM, for reasons expressed above, that portion of the lower courts' judgments which cast ConAgra with damages for breach of contract in the amounts of $357,000.00 (damages associated *458 with the loss of the broiler operation), $202,250.64 (damages associated with the "tax-bunching" effect), and $75,000.00 (general damages). However, we REVERSE the lower courts insofar as they found Miller's LUTPA claim timely and VACATE the treble damages and attorney fees awarded under that statute.

DECREE
AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART.
NOTES
[*] Retired Judge Thomas C. Wicker, Jr., sitting ad hoc for Weimer, J., recused.
[1] The trial judge denied the motion for reasons orally given in open court on July 18, 2005, and later signed a judgment formally denying the motion on January 9, 2006. The court's written reasons for judgment also discuss this decision.
[2] 28 U.S.C. § 157 states, in pertinent part:

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title. (2) Core proceedings include, but are not limited to 
(A) matters concerning the administration of the estate;
....
(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims;
[3] 28 U.S.C. § 1334(b) states:

Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.
[4] Prior to rendering judgment, ConAgra filed an unsuccessful motion to stay the trial court's proceedings pending resolution of the bankruptcy case and a motion to dismiss based on judicial estoppel and an exception of no right of action.
[5] Civil Code article 1997 provides, "An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform."
[6] Civil Code article 1998 provides:

Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
[7] LSA-R.S. 51:1409(E) states, "The action provided by this section shall be prescribed by one year running form the time of the transaction or act which gave rise to this right of action."
[8] LSA-R.S. 51:1409(A) provides, in pertinent:

If the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained. In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs.
[9] As to the "tax-bunching" damages mentioned above, Miller's expert testified essentially as follows: Had ConAgra not breached the contract, Miller would have enjoyed an estimated conservative amount of net profits on each of the ten successive years that the contract was to be performed and would have had to pay federal income tax, state income tax, and self-employment tax on that income. Because of the contract breach, however, plaintiff in fact had losses (and the tax advantage of those losses) in the respective years of the period. On the other hand, when and if the court awards him $357,000.00 for damages associated with the breach of contract, the expert testified that Miller will pay a larger amount in taxes upon receipt of those damages than he might have paid on those sums had there been no breach and had the sum  which the breach denied him  been received annually over a ten-year period. The differential effect of the principal tax burden in the year of receipt compared to the taxes he would have paid on his business profits over each of the ten years is what the expert calculated to be the adverse "tax-bunching effect" of the breach. In all, Miller's expert testified that, because of the district court's contemplated award, he would incur an additional $160,044.50 in federal income tax, $21,504.38 in state income tax, and $20,701.76 in self-employment tax; or $202,250.64 all told. As discussed later, see infra section IV of the Discussion, we find no need to, and refrain from commenting on the correctness of this portion of the district court's ascertainment and calculation of damages.
[10] When a bankruptcy proceeding is filed under Chapter 7 of the Bankruptcy Code (Chapter 7 is also referred to as "Liquidation"), a trustee is immediately appointed to administer the affairs of the bankruptcy estate. See 11 U.S.C. §§ 701-704 (mandating the immediate appointment of an interim trustee, followed by the election of a permanent trustee, and describing the duties of the trustee). However, under a Chapter 11 proceeding ("Reorganization"), the "debtor in possession" ordinarily controls his assets in place of the trustee. See 11 U.S.C. §§ 1101, 1107 (defining a "debtor in possession" and describing his duties). Thus, when Miller's bankruptcy was converted from a Chapter 7 to a Chapter 11 proceeding, Miller became a debtor in possession and the Chapter 7 trustee had no further role in the proceedings, prompting his withdrawal from the state lawsuit.
[11] LSA  R.S. 51:1409(A) states, in pertinent part, "If the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained." (Emphasis added).
[12] LSA  C.C.P. art. 1005 states, "The answer set forth affirmatively ... estoppel ... and any other matter constituting an affirmative defense."
[13] LSA  C.C.P. art. 1002 states, "Notwithstanding the provisions of Article 1001, the defendant may file his answer at any time prior to confirmation of a default judgment against him."
[14] ConAgra also cites us to a "Report and Recommendation" issued by the bankruptcy court wherein the merits of the judicial estoppel issue are discussed. Although that report is not a part of the record, ConAgra urges us to take notice of it because it is, according to ConAgra's brief, "a published opinion that is now part of the jurisprudence concerning judicial estoppel."

We decline to take such notice. This is not a published opinion; it is a report and recommendation from the bankruptcy court to the federal district court. While LSA-C.E. art. 202(A) requires us to take notice of the laws of the United States, including judicial decisions which are "authoritative," see LSA-C.C. art. 202, Comment (c), the statute does not include an unpublished report such as this. See, e.g., Finnie v. LeBlanc, 03-1013, p. 10-11 (La.App. 3 Cir. 3/10/04), 875 So.2d 71, 79 (refusing to take notice of pleadings, orders, and minute entries filed in a Chapter 7 bankruptcy proceeding). The fact that the report is found on an electronic database does not constitute "publication," ConAgra's arguments notwithstanding. Furthermore, if we were to take notice of this report, we would also be inclined to take notice of the actions of the Western District of Louisiana subsequent to this report, which stayed the bankruptcy court.